# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85842-4-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| RACHEL ANNE CALDWELL, | |
| Appellant. | |

FELDMAN, J. — Rachel Caldwell-Bash[1] appeals her conviction for felony violation of a no-contact order under RCW 26.50.110(5).[2] She claims the trial court erred in denying her motion to suppress a previous conviction, relied on by the State as a predicate offense in the instant case, on the basis that it was constitutionally invalid for that purpose based on ineffective assistance of prior defense counsel. Because Caldwell-Bash failed to satisfy her initial burden to make a colorable, fact-specific showing in support of her claim of constitutional invalidity as to the predicate offense, we affirm.

---

[1] This opinion refers to appellant as Caldwell-Bash because that is how she self-identifies.

[2] All citations to RCW 26.50.110 are to the provisions in effect at the time of Caldwell's offense, former RCW 26.50.110 (2019), *repealed by* LAWS OF 2021, ch.215, § 170 (effective July 1, 2022). Chapter 7.105 RCW now governs civil protection orders. RCW 7.105.550(2) provides, "Nothing in chapter 215, Laws of 2021 affects the validity of protection orders issued prior to July 1, 2022, under . . . former chapter[ ] . . . 26.50 RCW. Protection orders entered prior to July 1, 2022, under . . . former chapter[ ] . . . 26.50 RCW are subject to the provisions of chapter 215, Laws of 2021 and are fully enforceable under the applicable provisions of RCW 7.105.450 through 7.105.470."

I

On August 7, 2021, Caldwell-Bash gestured at her stepson in a grocery store where he worked, allegedly violating a no-contact order that protected him. The State charged Caldwell-Bash with felony violation of a no-contact order under RCW 26.50.110(5). In relevant part, the statute provides, "A violation of a court order . . . is a class C felony if the offender has at least two previous convictions for violating the provisions of an order issued under this chapter. . . ."

As required by RCW 26.50.110(5), the State alleged two predicate offenses. The first offense occurred in 2013, when Caldwell-Bash waved to her stepson at school while dropping off her biological children at the school. The second offense occurred in 2017, when Caldwell-Bash sent a Facebook message to her stepson. In both instances, Caldwell-Bash pled guilty to violation of the applicable no-contact order.

Caldwell-Bash filed in the trial court a motion in limine to suppress the 2013 conviction. In support of the motion, she argued the 2013 conviction could not constitute a predicate offense because she was not properly advised by her attorney at the time regarding the potential immigration consequences of her guilty plea. This, she argued, rendered her guilty plea involuntary and unintelligent.

Caldwell-Bash's motion in limine was raised at three hearings. The first judge recused themself. When the second hearing occurred, Caldwell-Bash submitted a declaration in which she testified that her attorney at the time of the 2013 guilty plea, Carla Lord, "did not advise me of any potential immigration consequences that could result from a conviction." In response to that declaration, which had not yet been filed with the court, the State's attorney complained that

the declaration had not previously been disclosed and, while doing so, remarked, "[t]hey now have a fact specific claim." The judge took the motion in limine under advisement but did not issue a ruling.

The motion was then raised again before a third judge who issued the sole ruling on this motion. By this time, the State had submitted a response to Caldwell-Bash's declaration and now argued Caldwell-Bash could not establish a fact specific claim. Contradicting Caldwell-Bash's declaration, the State submitted the plea form that Caldwell-Bash signed with regard to the 2013 conviction. Relevant here, the form included the following language:

> If I am not a citizen of the United States, a plea of guilty to an offense punishable as a crime under state law is grounds for deportation, exclusion from admission into the United States, or denial of naturalization pursuant to the laws of the United States.

Also relevant here, the form provides:

> My lawyer has explained to me, and we have fully discussed, all of the above paragraphs. I understand them all.

Lord also signed the plea form and by doing so confirmed: "I have read and discussed this statement with the defendant and believe that the defendant is competent and fully understands the statement."

In addition to the 2013 plea form, the State also submitted a declaration of Lord regarding her legal representation of Caldwell-Bash as to the 2013 guilty plea. Consistent with her contemporaneous certification in the plea form, Lord testified that, pursuant to her general practice of advising clients, she would "review the guilty plea statement line by line out loud with [her] client" and would "then ask if

the client had any questions or wanted any further explanation."[3]  Then, after

addressing any questions, Lord "advised the client to read the guilty plea statement

if they wished and would then have them sign the statement."

Based on this evidentiary record, the court denied Caldwell-Bash's motion

in limine.  Applying the standard set forth in *State v. Summers*, 120 Wn.2d 801,

846 P.2d 845 (1993), which we discuss below, the court ruled, "I don't find that the

Defendant has met the initial burden of offering a colorable fact-specific argument

supporting a claim of constitutional error in the prior conviction."  The case

thereafter proceeded to a three-day trial, after which the jury found Caldwell-Bash

guilty.  This timely appeal followed.

II

Caldwell-Bash presents a single assignment of error framed as the State's

failure to meet its burden of proof as to the essential elements of the charged crime

such that she was denied due process.  In support of her assignment of error,

Caldwell-Bash argues the trial court erred in its conclusion that she failed to make

a colorable, fact-specific showing that her 2013 conviction was constitutionally

deficient based on ineffective assistance of her trial counsel in that case and

thereby shift the burden to the State to prove the conviction was sound for

purposes of serving as a predicate offense.  We disagree.

A challenge to a predicate offense is not a collateral attack to the underlying

conviction, but rather a move to "'foreclose the *prior* conviction's *present* use to

establish an essential element of . . . [t]he crime.'"  *Summers*, 120 Wn.2d at 810

---

[3] As Lord's declaration clearly states, she would "review" the guilty plea statement with her client, which confirms she did more than merely read it aloud.

(alteration in original) (quoting *State v. Swindell*, 93 Wn.2d 192, 196, 607 P.2d 852 (1980)). "Procedurally, and as a preliminary matter, the trial court determines the validity of a prior conviction for the purpose of RCW 26.50.110(5)." *State v. Robinson*, 8 Wn. App. 2d 629, 635, 439 P.3d 710 (2019). We review such determinations de novo. *Id.*

Our Supreme Court established a burden shifting test for challenges to the constitutional sufficiency of predicate offenses in *Summers*. The defendant carries the initial burden to make a "colorable, fact-specific argument supporting the claim of constitutional error in the prior conviction." *Summers*, 120 Wn.2d at 812. If the defense makes that preliminary showing, the State must then "prove beyond a reasonable doubt that the predicate conviction is constitutionally sound" for use to satisfy an essential element of the charged crime. *Id*.

In support of her motion to suppress the 2013 conviction, Caldwell-Bash claimed that Lord was ineffective because she failed to properly advise her regarding the potential immigration consequences of her guilty plea. Our Supreme Court has recognized that ineffective assistance of counsel "can render the defendant's guilty plea involuntary or unintelligent." *State v. Sandoval*, 171 Wn.2d 163, 169, 249 P.3d 1015 (2011). To establish the plea was involuntary or unintelligent because of counsel's inadequate advice, "the defendant must satisfy the familiar two-part *Strickland v. Washington,* 466 U.S. 668 (1984), test for ineffective assistance claims—first, objectively unreasonable performance, and second, prejudice to the defendant." *Id.* If Caldwell-Bash fails to satisfy either prong, we need not inquire further. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917

P.2d 563 (1996). A claim of ineffective assistance of counsel is also reviewed de novo. *State v. Azevedo*, 31 Wn. App. 2d 70, 81-82, 547 P.3d 287 (2024).

A constitutionally competent defense attorney must provide advice about immigration consequences during the plea process. *Sandoval*, 171 Wn.2d at 170. "[T]he precise advice required depends on the clarity of the [applicable immigration] law." *Id.* (citing *Padilla v. Kentucky*, 559 U.S. 356 (2010)). On the one hand, "[i]f the applicable immigration law 'is truly clear' that an offense is deportable,[4] the defense attorney must correctly advise the defendant that pleading guilty to a particular charge would lead to deportation." *Id.* (quoting *Padilla*, 559 U.S. at 369). On the other hand, "if 'the law is not succinct and straightforward,' counsel must provide only a general warning that 'pending criminal charges may carry a risk of adverse immigration consequences.'" *Id.* (quoting *Padilla*, 559 U.S. at 357). Explaining this requirement, our Supreme Court stated, "In other words, even if immigration law does not reveal clearly whether the offense is deportable, competent counsel informs the defendant that deportation is at least possible, along with exclusion, ineligibility for citizenship, and any other adverse immigration consequences." *Id.*

Applying this test here, we must first determine whether the possible immigration consequences of a guilty plea were "truly clear" or "not succinct and straightforward." Caldwell-Bash claims when she pled guilty in 2013 to violating

---

[4] One of the changes to U.S. immigration law and practice that resulted from the passage of the Illegal Immigration Reform and Immigration Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996), was that the process previously known as "deportation" was replaced with "removal" proceedings. Both terms may appear in case law addressing immigration consequences of criminal convictions and are understood to have sufficiently similar meanings as to be nearly interchangeable.

the applicable no-contact order, she was potentially removable under 8 U.S.C. § 1227(a)(2)(E)(ii). This statutory provision states:

> Any alien who . . . is enjoined under a protection order issued by a court and whom the court determines has engaged in conduct that violates the portion of a protection order that involves protection against credible threats of violence, repeated harassment, or bodily injury to the person or persons for whom the protection order was issued is deportable.

Thus, for a non-citizen to be removable under § 1227(a)(2)(E)(ii), there must be a judicial determination regarding the precise nature of the unlawful conduct and corresponding protection order violation.

Given this required judicial determination, the immigration consequences of Caldwell-Bash's 2013 guilty plea were neither "truly clear" nor "succinct and straightforward." While persons at risk of removal (anyone who is not a citizen of the United States) may be "categorically" removable under one of the other provisions of § 1227(a)(2), § 1227(a)(2)(E)(ii) is not framed in terms of criminal convictions. *Garcia-Hernandez v. Boente*, 847 F.3d 869, 871-72 (2017). "The text of (E)(ii) does not depend on a criminal conviction, but on what [an immigration] court 'determines' about the alien's conduct." *Id*. at 872. Specifically, a non-citizen is removable only if the court "determines" that their conduct violates a portion of the order that "involves protection against credible threats of violence, repeated harassment, or bodily injury." Id. at 871. Because this determination is uncertain, the immigration consequences of Caldwell-Bash's 2013 guilty plea alone were neither "truly clear" nor "succinct and straightforward."

It therefore follows, under *Sandoval*, that Caldwell-Bash's attorney was required to warn her that a guilty plea could "'carry a risk of adverse immigration

consequences,'" such as exclusion, ineligibility for citizenship, and any other adverse immigration consequences. 171 Wn.2d at 170 (quoting *Padilla*, 559 U.S. at 368). The record before the court that decided this issue (the third judge in the progression described above) shows that Lord satisfied this requirement. As the trial court noted, Caldwell-Bash "signed a guilty plea statement that contained a warning about immigration consequences." The court further noted that Lord also signed the plea form and provided a declaration that explained her process for reviewing plea forms with clients. Thus, the contemporaneous record shows Lord warned Caldwell-Bash that a guilty plea could carry a risk of adverse immigration consequences, that Caldwell-Bash and her attorney "fully discussed" this warning, and that Caldwell-Bash understood the warning at the time of signing.

Caldwell-Bash claims that her declaration, by itself, is sufficient to satisfy her burden to make a threshold "colorable, fact-specific showing of constitutional error" under the *Summers* test. But the declaration is unsupported by corroborating evidence and the record contradicts her assertions. Contrary to her testimony that "Ms. Lord did not advise me of any potential immigration consequences that could result from a conviction," Caldwell-Bash's contemporaneous signature on the 2013 plea form indicates otherwise. Caldwell-Bash's statement also is contrary to the declaration of her attorney, who testified consistently with her certification in the 2013 plea form. On this record, the trial court did not err in ruling that Caldwell-Bash failed to satisfy "the initial burden of offering a colorable fact-specific argument supporting a claim of constitutional error in the prior conviction."[5]

---

[5] As noted previously, when Caldwell-Bash first submitted the declaration that is discussed in the text above, the State's attorney remarked, "they now have a fact specific claim." Caldwell-Bash does not mention that remark in her appellate briefing nor does she argue the State cannot

Citing *Padilla*, Caldwell-Bash next argues that the relevant immigration law is "succinct, clear, and explicit" and that, like Padilla, she pled guilty to "an offense that was obviously deportable under 8 U.S.C. § 1227(a)(2)(E)(ii)." Caldwell-Bash's reliance on *Padilla* is misplaced. Padilla pled guilty to transportation of a large amount of cannabis. 559 U.S. at 359. The consequence of removal was "succinct, clear, and explicit" from § 1227(a)(2)(B)(i), which provides as follows:

> Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance . . . , other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.

*Padilla*, 559 U.S. at 368. The Court also noted that Padilla's counsel could have "easily determined that [Padilla's] plea would make him eligible for deportation simply from reading the text of the statute . . . which . . . specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses." *Id.* at 368. As the above discussion of § 1227(a)(2)(E)(ii) shows, the same cannot be said here.

Caldwell-Bash's reliance on *Sandoval* is equally misplaced. This case differs from *Sandoval* in two significant respects. First, the relevant immigration consequences in *Sandoval* were "straightforward enough for a constitutionally competent lawyer to conclude that a guilty plea . . . would have subjected Sandoval to deportation." 171 Wn.2d at 172. Second, Sandoval's counsel wrongly assured Sandoval he "would not" be removable (at least not immediately) if he pled guilty

---

contradict it under judicial estoppel principles or otherwise. This opinion therefore does not address any such argument. *See State v. Chamberlin*, 161 Wn.2d 30, 37 n.3, 162 P.3d 389 (2007) ("The parties did not raise or brief this issue, and we decline to reach it here.").

to third degree rape even though the offense constituted an "aggravated felony" under 8 U.S.C. § 1101(a)(43)(A) and, thus, rendered Sandoval removable under § 1227(a)(2)(A)(iii), which states that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable." 171 Wn.2d at 172-73. Those circumstances are not present here: as the above discussion shows, the relevant immigration consequences were neither "truly clear" nor "succinct and straightforward," and there is no allegation that Caldwell-Bash received misleading advice. Like *Padilla*, *Sandoval* does not require reversal here.

In sum, because Caldwell-Bash failed to offer a colorable, fact-specific argument supporting the claim of constitutional error in the prior conviction, the burden did not shift to the State to prove beyond a reasonable doubt that her prior convictions were constitutionally sound. The trial court correctly so ruled.

Affirmed.

Feldman, J.

No. 85842-4-I <u>State of Washington v. Rachel Ann Caldwell</u>

B<small>IRK</small>, J. (concurring) — I concur in the result to affirm.

_Birk, J._

State of Washington v. Rachel Anne Caldwell, No. 86382-7-I

HAZELRIGG, C.J. (concurring) — I concur with the result of the lead opinion but write separately to highlight dissonance in the existing jurisprudence regarding ineffective assistance of counsel and the obligation of defense attorneys to provide guidance to their client on the risk of adverse immigration consequences that may flow from a criminal conviction.

A brief expansion of the relevant facts of this case, as adduced at trial and the pretrial hearings on Rachel Caldwell-Bash's[1] motion, provides necessary context for the analysis of this critical question given the gravity of the consequences at issue. Caldwell-Bash's stepson, Ian Bash, was the protected party in a no-contact order that had been issued pursuant to Caldwell-Bash's 2017 misdemeanor criminal conviction. On August 7, 2021, Caldwell-Bash and her daughter, E, stopped at a pharmacy in a grocery store that she had used twice a month for nearly two decades. Unbeknownst to Caldwell-Bash, her stepson had begun working at that grocery store. Bash approached his half-sister, E, and they hugged until Caldwell-Bash called E back before departing the store. Bash initially reported that after the parties went their separate ways, he returned to his department within the grocery store and observed Caldwell-Bash reenter the store and make a gesture at him with her middle finger.[2] The State charged Caldwell-Bash with felony violation of a no-contact order (VNCO) based on this incident and

---

[1] This concurrence uses the name by which the defendant identified herself during her testimony at trial.

[2] Bash's testimony at trial offered a different account of this part of the interaction after he was confronted with security footage from the grocery store.

alleged that it was a crime of domestic violence based on the familial relationship between Caldwell-Bash and Bash.

The two predicate offenses that the State offered to elevate the crime to a felony were a 2013 conviction in Ferndale Municipal Court for misdemeanor VNCO (2013 FMC VNCO) after Caldwell-Bash waved at Bash when she dropped her children off at a local youth center and a 2017 conviction for the same offense originating in Whatcom County District Court that resulted from an incident where Bash contacted Caldwell-Bash from a social media account that hid his true identity and she responded. Caldwell-Bash's attorney in the felony case moved in limine to exclude both convictions as constitutionally deficient for purposes of serving as predicate offenses necessary to elevate the 2021 allegation to a felony, but Caldwell-Bash's appeal only assigns error to the trial court's ruling as to the 2013 FMC VNCO.

In making that ruling, the trial court relied heavily on the fact that as to the 2013 FMC VNCO conviction, Caldwell-Bash "signed a guilty plea statement that contained a warning about immigration consequences." The court further noted that both Caldwell-Bash and her attorney Carla Lord had signed the plea form and Lord had provided a declaration that explained her process for reviewing plea forms with clients. Lord's declaration included the following statements:

> 5. I don't specifically recall being present for the entrance [sic] of plea and sentence in Rachel Caldwell's Ferndale Municipal Court [case number] on August 16th, 2013.
> 6. It was my routine practice prior to any client of mine signing or entering a guilty plea to review the guilty plea statement line by line out loud with my client, then ask if the client had any questions or wanted any further explanation.

In *State v. Sandoval*, the State and amicus Washington Association of Prosecuting Attorneys argued that the preprinted warning regarding the immigration consequences of a guilty plea set out in the statement of defendant on plea of guilty as required by RCW 10.40.200, along with the judge's confirmation during the plea colloquy that Sandoval's counsel had reviewed the entirety of the document with him, were sufficient to counter any affirmative inaccurate advice of defense counsel on that issue. 171 Wn.2d 163, 172-73, 249 P.3d 1015 (2011). Our Supreme Court expressly found those arguments "unavailing" and, in explaining its reasoning, noted that *Padilla v. Kentucky,* 559 U.S. 356 (2010) held that such general admonitions set out in plea forms, even those statutorily required, "do not excuse defense attorneys from providing the requisite warnings." *Id.* at 173. *Sandoval* emphasized that the justices in *Padilla* concluded that the "plea-form warnings underscored 'how critical it is for *counsel* to inform [their] noncitizen client that [they] face[] a risk of deportation.'" 171 Wn.2d at 173 (quoting *Padilla*, 559 U.S. at 373-74).

It stands to reason that if simply relying on the presence of those written warnings in the plea statement cannot satisfy the standard for effective assistance of counsel for purposes of the obligations under *Padilla* and *Sandoval*, then merely reading those same words out loud should not suffice either. And this would be particularly true here, where counsel had no specific recollection of the plea in question and offered a description only of her "routine practice" of reviewing guilty plea statements with clients. Counsel offered no description at all of any practice with regard to the content of her advice on immigration consequences, to say nothing of what, if anything, she actually advised Caldwell-Bash about immigration

consequences. Lord's declaration is comprised of six total points, two of which refer to her identity and professional experience, and it is entirely silent on whether she inquired as to Caldwell-Bash's immigration status, or that of any other client, as part of her routine practice.

The *Padilla* Court emphasized that

> [c]ounsel who possess the most rudimentary understanding of the deportation consequences of a particular criminal offense may be able to plea bargain creatively with the prosecutor in order to craft a conviction and sentence that reduce the likelihood of deportation, as by avoiding a conviction for an offense that automatically triggers the removal consequence. At the same time, the threat of deportation may provide the defendant with a powerful incentive to plead guilty to an offense that does not mandate that penalty in exchange for dismissal of a charge that does.

559 U.S. at 373. However, in Washington, defense counsel even without a "rudimentary understanding" of the intersection of immigration and the criminal legal system have extensive resources at their disposal in order to meet their duties under *Padilla* and *Sandoval*. For example, and specifically relevant to Caldwell-Bash's case, the Washington Defender Association (WDA) Immigration Project has a publicly available reference sheet specifically titled "Defending Noncitizens Charged with Domestic Violence Protection Order Violations"[3] that not only provides step-by-step guidance, regarding different categories of noncitizens, with citations to relevant authority, but also plainly states that "[d]efenders are advised to seek case-specific information from WDA's Immigration Project" and provides a hyperlink for individualized case assistance.[4] The WDA Immigration Project has been in existence

---

[3] https://defensenet.org/wp-content/uploads/2013/01/WDAIP-DV-VNCO-Advisory-6.2025.pdf.
[4] https://defensenet.org/case-support/wda-immigration-project/wdaip-case-assistance/.

since 1999[5] and was a resource available to Lord at the time of Caldwell-Bash's plea in 2013.

I agree with the determination of the lead opinion that we must evaluate the decision on this motion based on the evidence that was before the court at the time of its ruling. Lead opinion at 8. I further join in the conclusion that while Caldwell-Bash also provided a declaration in which she asserted that she would not have entered the guilty plea in the 2013 FMC VNCO if Lord had advised her that the conviction put her at risk of removal, her declaration is silent regarding the language in the plea form she signed in that case, which included the statutorily required warning and her explicit acknowledgement of the various admonitions contained therein. It is for these reasons that I concur with the outcome affirming the trial court's ruling that denied Caldwell-Bash's motion.

Though Lord described her "routine process" under penalty of perjury, she admitted to not having an independent recollection of Caldwell-Bash's plea and, to the extent stated in her declaration, her routine practice, assuming it was followed in Caldwell-Bash's case, was limited to merely reading the language from the plea form and allowing her client to ask questions. Lord did not make any claims or describe any practices as to ever inquiring about Caldwell-Bash's immigration status, much less specifically advising her about particular immigration consequences. The sole information in that regard is a bare inference that she would have read any warnings contained in a plea form and asked if Caldwell-Bash had any questions. As to the substance of Lord's declaration, I am not

---

[5] https://defensenet.org/case-support/wda-immigration-project/about-wdas-immigration-project/.

convinced that the evidence in this case meaningfully rises above the arguments our Supreme Court rejected in *Sandoval*. My concurrence in affirming the trial court's ruling is based narrowly on the fact that Caldwell-Bash's declaration, considered by the trial court alongside the 2013 FMC VNCO guilty plea, fails to mention, much less controvert, her statements in the guilty plea.

As noted in the lead opinion at 5, the *Strickland v. Washington,* 466 U.S. 668, 687 (1984) test for ineffective assistance of counsel requires both a showing of deficient performance and prejudice. We apply a deferential standard, and if counsel's "conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). Our Supreme Court in *Sandoval* noted that "even if immigration law does not reveal clearly whether the offense is deportable, *competent counsel informs the defendant that* [*removal*] *is at least possible, along with exclusion, ineligibility for citizenship, and any other adverse immigration consequences*." 171 Wn.2d at 170 (emphasis added). It logically flows, then, that one cannot satisfy the requirement of "competent counsel" if one remains ignorant to their own client's immigration status. There is simply no strategic or tactical reason to fail to inquire as to the immigration status of one's client, particularly in the context of plea negotiations.

Again, the United States Supreme Court recognized the unique interplay between immigration consequences and criminal convictions when it concluded that advice on that topic falls under the right to counsel pursuant to the Sixth Amendment. *See Padilla*, 559 U.S. at 366. ("We conclude that advice regarding

deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel."). In fact, the *Padilla* court further

> recognized that "'[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence.'" [*Immigration & Naturalization Serv. v.*] *St. Cyr*, 533 U.S. [289,] 322 [(2001)] (quoting 3 Bender, Criminal Defense Techniques §§ 60A.01, 60A.02[2] (1999)). Likewise, we have recognized that "preserving the possibility of" discretionary relief from deportation under § 212(c) of the 1952 INA, 66 Stat. 187, repealed by Congress in 1996, "would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead proceed to trial." *St. Cyr*, 533 U.S. at 323. We expected that counsel who were aware of the discretionary relief measures would "*follo*[*w*] *the advice of numerous practice guides*" to advise themselves of the importance of this particular form of discretionary relief. *Ibid.*, n.50.

559 U.S. at 368 (emphasis added) (some alterations in original). Plainly, the justices sitting on our nation's highest court did not think it unreasonable to expect defense counsel to use available resources such as practice guides in order to provide their clients with the information necessary to make informed decisions about the resolution of their criminal case. And again, because it is impossible to over-emphasize, even this most rudimentary step toward competent representation cannot occur in any meaningful way without a preliminary inquiry by defense counsel into the immigration status of their client.[6]

Best practices naturally call for much more from defense attorneys in that regard, such as seeking out publicly available practice advisories tailored to Washington law or case-specific guidance from a qualified immigration law

---

[6] A proper inquiry starts at the initial intake appointment by simply asking each client where they were born and proceeding with relevant follow up questions if they answer anything other than a location within the United States.

Again, the WDA has a publicly available online guide that explains how to inquire about the immigration status of the accused, in addition to definitions of various statuses and images of the corresponding documentation. *See* https://defensenet.org/immigration-status-and-consequences/.

practitioner dedicated to assisting criminal defense attorneys, or simply referring the client directly to an immigration attorney who can provide tailored advice. However, merely reading the same preprinted general warnings that the United States Supreme Court and our State Supreme Court have held are insufficient when provided solely in written form cannot be adequate to satisfy defense counsel's obligations to provide effective representation to clients at risk of removal under *Padilla* and *Sandoval*.